UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

James J. Fisher, Jr.
19 Plain Road
Hinsdale, NH 03451
     Plaintiff

v.                                    Docket #: _____

Town of Winchester
Winchester Police Department
1 Richmond Road
Winchester, NH 03470,
     Defendant

**COMPLAINT AND REQUEST FOR JURY TRIAL**

NOW COMES James J. Fisher, Jr., Plaintiff, by and through his attorney, Law Office of Leslie H. Johnson, PLLC, and complains against the Town of Winchester, including the Winchester Police Department, Defendant, and in support thereof states as follows:

**INTRODUCTION**

**PLAINTIFF REQUESTS A TRIAL BY JURY**

1.     Plaintiff James J. Fisher, Jr. (hereinafter "Mr. Fisher" or "Plaintiff") brings this action pursuant to the common law and statutory laws of the State of New Hampshire and United States, particularly for overtime wages (RSA 279, et seq.) and the Fair Labor Standards Act of 1938, as amended ((FLSA) 29 U.S.C. 201, et seq.), violation of the Whistleblowers' Protection Act (RSA 275-E, et seq.), for Wrongful Discharge (constructive); FMLA violations and for interference and retaliation; and violation of various constitutional rights. Plaintiff seeks to recover all damages as allowed by law, and all equitable relief to which he may be entitled.

1

**PARTIES**

2.      James J. Fisher, Jr. (hereinafter "Mr. Fisher" or "Plaintiff"), is a citizen of New Hampshire, with a residential address at 19 Plain Road, Hinsdale, Cheshire County, NH 03451.

3.      Defendant, Town of Winchester, is a municipality within the County of Cheshire and State of New Hampshire, with a principal office address at 1 Richmond Road, Winchester, NH 03470.  The current Town Administrator is Karey Miner, c/o Town of Winchester, 1 Richmond Road, Winchester, NH 03470.  The current Chairperson of the Board of Selectmen is Ben Kilanski, c/o Town of Winchester, 1 Richmond Road, Winchester, NH 03470.  The Town of Winchester and the Winchester Police Department are collectedly referred to herein as "Defendant" and/or "WPD"; however, at all times the town is still responsible as the entity in charge.  The current chief of the Winchester Police Department is David Rice.

4.      Defendant Town is responsible for all of the actions of its departments, agents, elected representatives and employees, including the WPD, under the theories of vicarious liability and/or *respondent superior*, as well as responsible for their own actions and failures to act.

**VENUE AND JURISDICTION**

5.      Jurisdiction and venue are proper as Mr. Fisher lives in Cheshire County, and he worked for Defendant in Winchester, County of Cheshire New Hampshire, and is where the unlawful employment acts complained of were committed.

**STATEMENT OF FACTS**

6.      Dates herein are pinpointed specifically where possible.  Some dates are Mr. Fisher's best recollection and subject to change upon conducting discovery.  Our best efforts

were used to put the factual section of the Complaint in chronological order, unless the topic took precedence.

7. Mr. Fisher was hired in 2019 by Defendant as an Officer for the WPD. In January or February 2021, he was promoted to the rank of Lieutenant and Officer-in-Charge (the highest position at the time which should have been treated as the "chief" position), directly after Defendant voted to not renew Chief M. Tollett as Chief. Mr. Fisher's new position was a non-exempt from overtime position. Mr. Fisher was wrongfully discharged from employment, regarding which Mr. Fisher sent a letter to the town on or about June 6, 2024.

8. During various times Theresa Sepe and Lindseigh Picard were members of the Board of Selectmen for Winchester.

9. The WPD has been budgeted for eight (8) full time police officers, and several part-time officers, however even when Mr. Fisher was the Officer in Charge, and working dozens of hours of overtime per week, without getting paid, he was not allowed to fill most of the positions.

10. Due to staffing shortages, on or about January 2021, WPD consisted of only two officers eligible to cover shifts seven days a week, 24-hours per day and the Town, via the Board of Selectmen (hereinafter "BOS"), granted Mr. Fisher authorization to hire two officers. G. Phillips was hired part-time, and K.F. was hired full-time as a Patrol Supervisor/Sargeant. Phillips had previously retired from WPD as their police chief.

11. Again, due to staffing shortages, on or about January 2021 Defendant authorized the WPD to incorporate "on call hours" ("OCH"). OCH were to be reflected on each officer's time sheets and paycheck stubs. Thereafter, Town Administrator instructed Fisher to stop totaling

his on call hours on his timesheet, presumably so there would be no record of all of his hours worked.

12.     Due to the staffing shortage, Mr. Fisher worked as many as 90 (or more) hours per week, most of the time with no days off, and generally recording his OCH and explaining in the overtime (OT) box how many OCH hours he worked.  OCH hours were often in addition to hours physically worked in the field.

13.     On or about May 19, 2021 and June 23, 2021, during non-public meetings, both Selectpersons Sepe and Picard expressed to Mr. Fisher their unhappiness with having to provide a reasonable accommodation to Sgt. K.F., with Selectperson Sepe stating that when she had been in Mr. Fisher's position in her past employment she just terminated officers (instead of granting a reasonable accommodation).

14.     Mr. Fisher was further told by Selectwoman Picard that she was the BOS's "expert" on the Americans with Disabilities Act, although to the best of Mr. Fisher's information and belief, she had only been an insurance claims adjuster.

15.     Mr. Fisher had determined that K.F. had been performing his job well.

16.     At the public BOS meeting on May 19, 2021 it was acknowledged on the record that Mr. Fisher, as the Lt., was the "officer in charge".

17.     On or about June 28, 2021 while on duty, Mr. Fisher received a complaint by the niece of the Chairperson of the BOS, Ben Kilanski, against Officer J. Edson (male) (hereinafter referred to as the "Edson case").  The allegations were for serious misconduct.

18.     On or about June 29, 2021, Sgt. K.F. conducted an interview with the alleged victim and reports were generated by both Sgt. K.F. and Mr. Fisher.

19.     Consistent with WPD policy, due to the nature of who was involved, the conflict of interest if a police officer must criminally investigate a subordinate officer, and the fact there was no official Chief of Police at the time, Mr. Fisher consulted with the Attorney General's Office (AG) for direction and was told to notify and forward their reports to the NH State Police, and to not conduct any further interviews or disclose anything to anyone, including the BOS. Mr. Fisher complied.  He later learned the AG's Office was investigating the allegations.

20.     In August 2021, Ms. Miner and Ms. Bond asked Mr. Fisher to come to Bond's office to discuss the Edson matter.  During the meeting Mr. Fisher informed them the matter was confidential.

21.     Mr. Fisher had been instructed by the AGs office not to discuss the matter with anyone.  This was to protect the integrity of the investigation and so that Mr. Edson's constitutional rights were not violated, which included violation could have been consistent with the Town's history of suspending officers without due process, and without pay.

22.     On or about September 7, 2021, Mr. Fisher met with Selectwoman Sepe regarding a WPD applicant, D.C.  Selectwoman Sepe advised Mr. Fisher she did "not want to hire someone like Sgt. K.F., which he took to mean someone with a disability.  Ultimately, the BOS did not consider D.C. for the position even though he was well qualified.  Mr. Fisher believed this was against ADA policy and the law.

23.     On September 28, 2021, AG Timothy Sullivan wrote to the Town's counsel (Brooke Shiloh, Esq.) that the AG's office opened a criminal investigation against Officer Edson.

24.     The Town sought to have Mr. Fisher demoted from Officer-in-Charge, even though there was no police chief at the time and Mr. Fisher's job had continued responsibility as

5

Lieutenant, the senior ranking officer. By the time Chief Josephson retired, he had informed Mr. Fisher that Karey Miner, Town Administrator, was in charge of the police department.

25. Mr. Fisher asserts this was done in retaliation because Kilanski was not happy with how Mr. Fisher was handling the Edson case. Mr. Kilanski should have recused himself due to his conflict with the Edson case.

26. Because the staffing shortage had not improved, and Defendant would not allow Mr. Fisher to hire any additional staff, Mr. Fisher was forced to work ridiculous hours, including a lot of overtime, and was subjected to unreasonable amounts of OCH, which should have been paid as overtime.

27. Since becoming OIC, and until Josephson was hired, Mr. Fisher repeatedly requested to hire additional officers, which had been budgeted for.

28. In or around October 2021, E. Josephson was hired as the new Police Chief by the BOS even though he was not certified. In fact, to Mr. Fisher's knowledge and belief, Chief Josephson's last job was as Chief in Egremont, MA where his contract was not renewed due to alleged disputes with a subordinate.

29. Pursuant to the NH Police Standards and Training Council's directives, policy and procedure, Chief Josephson was required to be supervised by a full-time certified police officer, i.e. Mr. Fisher. Mr. Fisher informed Defendant of this, but they refused to allow the supervision of Chief Josephson, which was required by law.

30. On or about October 14, 2021, Sgt. K.F. began suffering from health issues which required a reasonable accommodation affecting his hours at work, which included that he was not required to cover OCH.

6

31.     Due to all the time Mr. Fisher was working and/or on call and the stress and sleep deprivation it caused, Mr. Fisher submitted FMLA documents on or about October 26, 2021 requesting a reasonable accommodation of at least one full day off work per week, including no OCH on that day, which Defendant purportedly granted.

32.     On or about November 21, 2021 Defendant approved the FMLA for Mr. Fisher, and then continually interfered with it throughout the remainder of his employment.

33.     On November 10, 2021, during the BOS meeting, a resident asked about on-call hours, to which Selectman Rokes stated because of staffing issues the BOS agreed to pay an on-call rate from 2am-6am in the amount of $25.00 per hour.

34.     To the best of Plaintiff's knowledge and belief, Defendant provided Sgt. K.F. with a reasonable accommodation for approximately one month and then unjustly suspended him without pay on or about November 12, 2021.  This is part of the pattern and practice of the Town in violating employee's civil rights.

35.     Instead of extending the accommodation for K.F. pursuant to the ADA, Defendant held a non-public hearing on or about January 19, 2022.

36.     Mr. Fisher was asked to attend the hearing for K.F., by his attorney, who has since then filed suit on his behalf in Court.

37.     On November 17, 2021, the BOS voted to clarify "on-call" pay, stating they had been paying $25.00 every two hours.  Selectwoman Sepe made a motion to have on-call pay be $25.00 per night on-call plus time and a half with a two-hour minimum if called out during on-call hours.  The motion was passed unanimously.

38.     The BOS opened an internal investigation into alleged misconduct by Mr. Fisher prior to hiring Chief Erik Josephson, which was related to his turning over the Edson case to the

AG, as instructed.  Mr. Fisher. Mr. Fisher first learned of allegations against him on or about December 13, 2021.

39.    On or about December 15, 2021, Mr. Fisher notified the investigator for the AG's Office about the Town's interference with the Edson case by Defendant opening an internal investigation and compelling Mr. Fisher to provide a statement.

40.    On or about January 18, 2022, Chief Josephson emailed Mr. Fisher and M. Platz (WPD's secretary) that Sgt. K.F. 's counsel wanted them to attend a public town hall meeting in which the BOS would be deciding whether to terminate Sgt. K.F.  Mr. Fisher's testimony would most likely discredit Chief Josephson and Mr. Fisher was concerned he would be terminated for his testimony.

41.    Mr. Fisher attended the hearing, but was not called to testify.

42.    On or about January 19, 2022, Defendant held a non-public hearing to discuss Sgt. K.F. and his need for an accommodation, which Mr. Fisher was in favor of.

43.    However, Defendant BOS decided to terminate K.F.'s employment effective January 25, 2022 rather than provide him with an accommodation pursuant to the ADA, therefore discriminating against Sgt. K.F. and thus causing WPD to be extremely short-staffed with Mr. Fisher forced to cover all OCH as Sgt. K.F. was one of the only other certified officers qualified to cover OCH.

44.    On or about January 20, 2022, Chief Josephson advised Mr. Fisher he was attempting to get outside agencies to cover shifts so Mr. Fisher could get a day of rest; however, in the meantime Mr. Fisher was required to cover all OCH, even with a doctor's note stating the need for one full day off duty.  This constituted interference with FMLA, and retaliation for taking FMLA, or attempting to.

8

45.     On or about January 27, 2022, Mr. Fisher received a Notice of Charges in which Chief Josephson (still an uncertified police officer) recommended his termination, alleging Mr. Fisher failed to report about the Edson case to Defendant even though Defendant was well aware Mr. Fisher could not disclose any of the details to them, including for the reason that one of them was a relative of the victim who had told her not to complain about the officer, thus interfering with the witness and the prosecution.

46.     On or about January 27, 2022, Mr. Fisher received a call from Defendant advising him he was suspended without pay and to return his equipment to the WPD.

47.     However, in doing so, Defendant failed to follow policy which required them to pay Mr. Fisher five-weeks' of pay as no notice of a hearing on suspension was held prior to suspension.  This followed the Town's pattern and practice of violation of rights, which had previously included K.F. and his suspension without pay.

48.     This suspension was retaliation against Mr. Fisher including, but not limited to, for having followed police policy, and a directive from the AG's office not to disclose anything to Defendant about the Edson case, for notifying the AG's Office about Defendant's interference, and for his support of K.F. in noting illegal discrimination perpetrated against him.

49.     On or about January 28, 2022, the Hinsdale Police went to Mr. Fisher's home to retrieve his WPD equipment.

50.     Due to the anxiety and fear Mr. Fisher suffered not knowing how long he would be without an income, and/or if he would be terminated, he placed his home up for sale in order to ensure he had funds to cover the monthly expenses of his family; the house sold on or about February 2022.

51. On February 10, 2022 and February 24, 2022 Defendant held hearings regarding whether Fisher was wrong not to tell Defendant/BOS details about the Edson investigation, which would have required him to ignore the directive from the AG, and further interfered in the investigation.

52. Although Defendant knew Mr. Fisher was under an obligation not to disclose details of the investigation of the Edson case to Defendant, Defendant compelled him to testify over the course of two evenings at his own termination hearing.

53. On March 3, 2022, a motion to terminate Mr. Fisher was made by Selectwoman Picard and seconded by Selectwoman Sepes, however the remaining two selectpersons voted no and thus the motion to terminate Mr. Fisher failed.

54. Given the "no" vote, Mr. Fisher was reinstated that night and returned to work the following day.

55. Notably, Defendant already had a draft report of findings against Mr. Fisher as of the time of the hearing, as if they had reviewed the evidence and already voted to terminate him prior to the hearing, which Mr. Fisher found out about later.

56. In fact, Defendant had no decision drafted in advance of the vote if it were to find for him, which Mr. Fisher also found out about later. This means the outcome was believed by the Town to be predetermined, thus demonstrating the retaliatory nature of this action.

57. The clear "no" vote was insufficient for Picard and Sepes who then asked the other two selectmen to put on the record their reasons for a no vote, which was highly unusual and should not have been requested.

58. Although Mr. Fisher was reinstated, he had to continue working under Chief Josephson, and under the same excessive hour requirements, including covering OCH. This

continued throughout Mr. Fisher's employment, and he was generally not given his FMLA time off.

59.     Sometime in 2022, a citizen (DP) filed a complaint about an arrest that occurred back in October 2020, which allegedly lacked probable cause.  Mr. Fisher explained to the complaining party that he could not do an internal investigation because those officers were no longer employed by the Town.

60.     At the time of that prior arrest (DP), Mr. Fisher was a patrolman, had not made that arrest, nor had he investigated that arrest/case.

61.     After Mr. Fisher's numerous complaints that constituted whistleblowing, Chief Josephson and BOS opened a second internal investigation into Mr. Fisher for not opening an internal investigation on that arrest (DP), which was an impossibility.

62.     Mr. Fisher believes the second investigation was started by Defendant primarily in retaliation for him not providing private details of the investigation into Edson, as he had been directed by the AG's office not to do so, and for whistleblowing regarding Defendant's ADA violations, complaining about violation of the overtime laws, complaining about interference with his own FMLA rights and retaliation for attempting to exercise those rights, and his objections to not being allowed to supervise Chief Josephson (uncertified), which was in violation of the NH Police Standards as noted by Mr. Fisher.

63.     To the best of Mr. Fisher's recollection, on or about June 2022, while Mr. Fisher was typing up an accident report in his office, Chief Josephson entered the doorway and advised him he had to speak with the Sheriff, which meeting was compelled.  This meeting was about the D.P. arrest and investigation, and the P.W. investigation.

64.    Sheriff Rivera interviewed Mr. Fisher behind closed doors.  Mr. Fisher understood he was not free to leave and that he was being forced to make a statement under duress.  Upon Mr. Fisher understanding this was a criminal investigation, he requested his Garrity rights.  After some disagreement, the Sheriff finally gave him the Garrity form.

65.    Mr. Fisher learned the Sheriff was being directed by Defendant to conduct an internal investigation of Mr. Fisher which could result in demotion, suspension and/or termination, and as such was acting as Defendant's agent.

66.    It was clear as the interview proceeded that Sheriff Rivera had not been properly informed of the facts by Defendant.

67.    To Mr. Fisher's knowledge and belief, Sheriff Rivera had over 20 years of experience at the time, having retired from the Keene Police Department and thereafter being Sheriff for many years.

68.    It is believed Sheriff Rivera was also a police prosecutor at one point in his career. Thus, it is only reasonable that he had a clear understanding of procedural and substantive due process, but violated those rules by compelling Mr. Fisher to give a statement under duress, at the direction of Defendant.

69.    At the end of the meeting, Sheriff Rivera told Mr. Fisher they should not have had the meeting, and shortly thereafter issued a one page report with a finding of unfounded.

70.    Mr. Fisher believes Defendant's representatives colluded to wrongfully terminate him, and that Selectwoman Sepe and Chief Josephson acted with malice with the purpose of establishing a pretextual purpose to terminate him.

71.    Defendant, along with Chief Josephson, committed further acts to sabotage Mr. Fisher's career and defame him.

12

72.     On or about March 17, 2022, an Officer (referred to as X) disclosed to Mr. Fisher that he had not been truthful in an accident report he prepared involving one of their cruisers. Due to same, and pursuant to policy, Mr. Fisher emailed Chief Josephson, about Officer X's Brady violation, which would mean Officer X should be placed on the EES.

73.     Interestingly, Defendant did not move to terminate Officer X or place him on the EES.  Instead, Defendant placed him on unpaid leave for 5 consecutive Mondays.  However, Chief Josephson called Officer X into work on some and/or all of those Mondays, effectively causing Officer X not be disciplined.

74.     On May 9, 2022 the Town acknowledged that Mr. Fisher had requested FMLA leave  based on a medical condition but only approved him for provisional leave from May 15, 2022 to May 19, 2022.

75.     In June 2022, Chief Josephson resigned; however, he extended his employment until September 2022.

76.     On or about June 15, 2022, the BOS voted to rewrite the Town's policy manual; however as of May 14, 2023 (almost a full year later), no new policy manual was provided to the WPD.

77.     On or about July 26, 2022, Mr. Fisher emailed Defendant to discuss ADA and overtime law and policies for officers being "on call".

78.     In approximately August 2022, Defendant agreed to compensate officers, including Mr. Fisher, $25.00 per night (typically 16 hours) to be "on call", but refused to pay overtime unless their attendance was actually required at a scene and/or the time they spent speaking on the phone with dispatch.

13

79.     However, Mr. Fisher, and other officers, were not allowed to be more than 30 minutes from work while in an on-call status, thus making it impossible for them to carry on their personal lives, including socializing with family or friends and having an occasional alcoholic beverage, thus justifying that they be paid their regular and/or overtime rate for each hour on call.

80.     On or about August 20, 2022, Defendant accepted Chief Josephson's resignation. At the time of his resignation, Chief Josephson was still an uncertified officer.  His resignation came on the heels of his firing Sgt. K.F. under the pretext of missing court, which was really because of K.F.'s need for, and/or exercise of, a reasonable accommodation.

81.     On or about September 9, 2022, Defendant through K. Miner and A. Bond, held the keys to the WPD's evidence room and the Chief's office, and would not allow Mr. Fisher, as Lieutenant and "Officer-in-Charge", to hold the keys, thereby interfering with the daily operations of the WPD, which was contrary to the statutory authority for chiefs and/or officers in charge.  This also interfered with the chain of evidence, and was highly irregular.

82.     The Town, which should not have had the keys in the first place, provided the uncertified captain keys to the evidence room for an audit in which he hired an outside consulting firm to go into the evidence room accompanied by a college student.  Plaintiff believed that this information would provide ample grounds for defense attorneys to argue about the chain of custody.

83.     Right after the request for the keys was made, Mr. Fisher emailed Miner and/or Bond explaining they should not have the keys.  Plaintiff also reported this to the Attorney General who said they would not get involved.

84.     On or about September 14, 2022, Mr. Fisher spoke with the County Attorney who informed him that the purpose of "mutual aid" was for an officer to request and receive assistance if and/or when needed by another town, not to cover the entire town.  Therefore, Mr. Fisher emailed K. Miner that it was improper to be using mutual aid in the way it was,  and notified Chief Josephson.

85.     On or about September 15, 2022, K. Miner and the BOS, maliciously, intentionally, and willfully, denied/interrupted Mr. Fisher's FMLA time, requiring him once again to cover OCH with no time off.

86.     On or about September 22, 2022, Mr. Fisher emailed Defendant alerting them to the fact he was being excluded from the decision making for WPD since Chief Josephson's departure, which was contrary to his Lieutenant's position and police policy, and NH RSA 105:2-a.

87.     Mr. Fisher believes this was done as a form of retaliation for both applying for FMLA, and his various whistleblowing, reports of public policy violations (discrimination, unpaid wages, etc.) and refusals to violate public policies, as referenced throughout this Complaint and above.

88.     Chief Josephson left employment with Defendant in October 2022.

89.     On or about October 2022, Mr. Fisher sent a letter to Defendant requesting a copy of Defendant's polices regarding OCH and overtime procedures.  Defendant provided him with a written directive, but not any policies.

90.     Thereafter, on or between October 2022 and December 2022 Mr. Fisher emailed Defendant asking if they were complying with overtime law, including the FLSA, and included a calculation for establishing an overtime rate of pay. On several of those occasions he attached

FLSA documents to assist Defendant on how to calculate his pay, which he believed should be overtime at time and ½ based on all hours.

91.    On or about December 9, 2022, A. Bond, emailed Mr. Fisher that he owed the Town money, introduced a "time rounding scale", and threatened disciplinary action. This was purportedly for Defendant overpaying Mr. Fisher, which Mr. Fisher disputes.

92.    Even if there had been a mistake on Mr. Fisher's timecard, of which he is unaware, Defendant had failed to pay him for substantial amounts of overtime by this point.

93.    Mr. Fisher responded to A. Bond with regard to her "time rounding scale", and questioned her math and time-keeping with a 24 hour clock, as the information she provided was not accurate.

94.    In response, Defendant threatened Mr. Fisher with "conduct unbecoming an officer", clearly another form of harassment, intimidation and retaliation by Defendant, here right after he questioned the overtime policy and his pay.

95.    Still being short-staffed, and without a police chief, on or about January 12, 2023, Mr. Fisher emailed K. Miner and requested the BOS's support in conducting the hiring process for new officers.

96.    On or about January 17, 2023, Sgt. K.F.  filed suit against Defendant in which Mr. Fisher's name appeared.

97.    On or about January 23, 2023, Mr. Fisher emailed K. Miner a second time asking if the BOS was going to support his conducting the hiring process.  Defendant never responded.

98.    Instead, on or about January 27, 2023, K. Miner emailed Mr. Fisher informing him that F.G. had been hired as a WPD Police Officer, with Defendant having purposefully excluded Mr. Fisher from the hiring process, which he should have been involved with as the

senior- ranking officer and "officer-in-charge" when there is no chief.  In fact, Mr. Fisher should have been in charge of the whole hiring process up to final approval.

99.     On or about February 12, 2023, Mr. Fisher emailed K. Miner requesting a day of rest as he had not had a day off since his vacation on December 22-26, 2022.

100.     On or about February 24, 2023, K Miner emailed Mr. Fisher stating, "You are not authorized to interview, coordinate or administer exams, initiate background checks, train, or hire new officers unless the Board of Selectmen direct you to do so in writing."

101.     This was even though Mr. Fisher was well qualified to do so, having successfully met the NH Police Standards and Training Counsel's requirements as a Use Of Force Instructor, Field Training Instructor, and completion of instructor development.  This also severely interfered with the statutory duties of Mr. Fisher as the officer in charge, including those under NH RSA 105:2-a.

102.     On or about February 25, 2023, Mr. Fisher emailed K. Miner and reiterated that his job description stated he was to "serve as acting Chief of Police in [the Chief's] absence".

103.     Even so, Defendant refused to allow Mr. Fisher to train Officer F.G., contrary to Mr. Fisher's job description as a Lieutenant is in charge of all training, and his statutory duties, including those under NH RSA 105:2-a.

104.     On or about March 2, 2023, Mr. Fisher invited the Town and BOS to a Primex training on harassment and discrimination to be held at the WPD.  Primex was the Town's insurance company.

105.     Mr. Fisher had taken the course online and wanted to provide it to at least the officers, and as he was in charge of training.  Mr. Fisher also thought it would help with insurance premiums for the Town, and perhaps inform some he had been dealing with about

17

illegal discrimination, such as for disability discrimination, which he had observed them perpetrate.

106.    On or about March 3, 2023, Primex reviewed the Town's harassment/ discrimination policy and determined that it was outdated and missing protected classes, as well as provided an incorrect EEOC field office address for employees to file complaints with.

107.    On or about March 19, 2023, Mr. Fisher emailed K. Miner requesting a copy of his revised job description; Defendant forwarded him a copy.  The revised description also stated the Lieutenant's position included to "serve as acting Chief of Police in his absence".

108.    On or about March 24, 2023, Primex canceled the harassment/discrimination training based on the fact Defendant Town was re-writing their policy.

109.    On or about March 24, 2023, Mr. Fisher emailed K. Miner requesting the new policy be forwarded to him upon completion so he could reschedule the training by Primex.  K. Miner replied stating A. Bond was working with legal and Primex, which policies the BOS would review on April 19, 2023.

110.    On or about April 1, 2023, Mr. Fisher reported much of the retaliation and discrimination he was suffering from Defendant up to that point, to Selectman H. Stephens, who informed Mr. Fisher that "those girls [meaning Selectwomen Sepe and Picard] have it out for you".

111.    Although Mr. Fisher is not sure of the date, in approximately the spring of 2023, the BOS granted K. Miner (Town Administrator) and A. Bond (Finance/HR Supervisor) significant pay increases, while M.P. (an employee of WPD and a loyal supporter of former Chief Phillips, whom Selectwoman Sepe did not like), who had been employed by Defendant for

as long or longer than Miner and Bond and who was over the age of 40 and potentially suffered from two disabilities/medical conditions, received no raise.

112. On or about April 5, 2023, Mr. Fisher emailed K. Miner the Defendant's pay step policy and questioned the fact that K. Minor and A. Bonds received significant pay raises for their longevity but M. Platz, who had equal longevity status, but was a witness to a civil suit involving Sgt. K.F., was excluded from an equal pay raise. At this time, Mr. Fisher had still not been paid most of the overtime due to him.

113. Mr. Fisher believes Defendant was discriminating against M. Platz because of her age and/or disabilities, and the fact she supported former Chief Phillips, who had previously sued Defendant Town.

114. On or about April 6, 2023, K. Miner emailed Officer F.G. that the BOS wanted to meet with him in a non-public meeting and then introduce him to the Town in a public meeting, Mr. Fisher as Officer-in-Charge should have been involved with this plan.

115. On or about April 11, 2023, Mr. Fisher emailed K. Miner alerting Defendant that a non-public meeting of this nature was contrary to RSA 91-A, as it was not a proper purpose for a non-public meeting, and that if they still planned to go forward with the meeting that he wanted to be present.

116. That same day, K. Miner emailed Mr. Fisher back stating that on behalf of the BOS he was being denied access to the meeting, and reiterated their position, stating "[t]he Town reminds you that you have not been appointed Officer in Charge, and responsibility for management of the Police Department rest with the Board." "If you continue to work outside of your role and disregard your chain of command, the Board will consider your behavior to be gross insubordination, which may result in discipline, up to and including termination."

19

117. However, there was no "chain of command"; as Mr. Fisher was senior and *de facto* officer in charge, which the Board more than likely recognized and refused to abide by.

118. Defendant was clearly not following policy, or NH Law (see NH RSA 105:2-a, Police Chiefs; Powers; Dismissal). A BOS cannot be in charge of the police department, especially the evidence room as it had usurped.

119. On or about April 19, 2023 the BOS voted to give all Town employees a four-day work week to be effective June 1st; however, the WPD was still required to work a five-day week with Mr. Fisher still covering OCH, and usually working 7 days per week.

120. To the best of Mr. Fisher's knowledge nothing was done at the time of his complaints of mistreatment, including discrimination and retaliation for whistleblowing. However, the Town hired an attorney, Kathleen Davidson to presumably investigate, whom Mr. Fisher met with on or about April 24, 2023.

121. Mr. Fisher never received any report prepared by Attorney Davidson, but sometime much later, he was forwarded an email by Ms. Miner that his allegations were unfounded. Mr. Fisher disagrees with that assessment and does not know if the Davidson report actually said that.

122. On or about May 5, 2023, Mr. Fisher instructed M. Platz to email the Chief of Police Association for assistance from outside agencies to cover evening shifts at detail rate, which was within Mr. Fisher's authority to do.

123. On or about May 12, 2023, N. Mercado called Mr. Fisher informing him that Defendant had or was scheduling an interview with Mercado for possible employment with the WPD.

124.    On July 10, 2023, Defendant issued a final written warning to Mr. Fisher alleging Mr. Fisher authorized certain training on the Town's new policy manual and trying to coordinate training on landlord/tenant laws, without prior authorization by the BOS.

125.    However, the BOS was not allowed by statute to be in charge of the police department, and it was within Mr. Fisher's authority, as the senior officer, to arrange trainings.

126.    On September 13, 2023, after several months of negotiations, Defendant entered into a Memorandum of Understanding (MOU) with the Town of Hinsdale, thus admitting Defendant did not have adequate coverage in its own police department, confirming the BOS was acting as the sole role of Police Chief for Winchester, and asking that Chief Charles Rataj, the Chief of Police for Hinsdale to become Defendant's "Interim Police Chief Administrator and provide Hinsdale police personnel to patrol in the Town of Winchester".

127.    The MOU was to be in effect for six months or until Defendant attained its own adequate police coverage. Chief Rataj would be first-in-charge of WPD and report directly to Defendant BOS.  This was all done without Mr. Fisher's knowledge or approval.

128.    On or about September 16, 2023, Mr. Fisher emailed Caption Rice and the new Interim Police Chief Rataj asking that the FLSA act be implemented in establishing his hourly rate of pay.  Mr. Fisher was advised they were working on it.

129.    On or about September 29, 2023, Defendant BOS created the new position of Captain, above Mr. Fisher's position as Lieutenant.  This position was created without a job description.  BOS then announced they hired David Rice as Captain.  Captain Rice (just like Josephson) was uncertified in New Hampshire.

130.    Defendant purposefully placed others above Mr. Fisher due to his whistleblowing and request for overtime, and the other whistleblowing and public policy reasons, which were extensive and on-going.

131.    It is against Police Academy requirements to have an uncertified officer in charge of the police department.

132.    On or about October 12, 2023, Mr. Fisher's counsel, Attorney Hoppock, notified Defendant's counsel that Mr. Fisher continued to work seven days per week along with being OCH every day as well, in violation of RSA 275:33.

133.    On or about November 6, 2023, Mr. Fisher emailed Captain Rice and Chief Rataj that it had been approximately 3 years that he had been working OCH without a 24-hour day of rest (except occasionally) and asked if he was mandated to cover the OCH, specifically stating he did not wish to cover any more OCH.

134.    The same day (11/6/23), Captain Rice emailed Mr. Fisher acknowledging the long hours he was working but stated Defendant Town "is of the opinion we can instruct you to be on-call".  At the time, Captain Rice was not certified, unable to cover shifts and reportedly being mentored by Chief Rataj.

135.    Defendant had elevated Captain Rice, an uncertified officer, over Mr. Fisher, and had an officer from outside the town acting as chief.

136.    The Captain was working unsupervised as he had no supervision by a certified officer or field training officer, which was contrary to New Hampshire Police Standards and Trainings Agreement.

137.    On or about November 14, 2023, Defendant sent/gave a letter to Mr. Fisher responding to his November 6, 2023 email.  Within the letter Defendant stated that in September

2022 the BOS approved his request for one day off per week with no OCH, that Mr. Fisher was required to schedule such 24-hour period each week (Monday-Thursday) for his day of rest.

138.    Ironically, and incredibly, Defendant instructed Mr. Fisher to be in charge of scheduling his day off, which was virtually impossible because there was nobody to cover 24 hours, and therefore it was an impossibility.

139.    Defendant acknowledged Mr. Fisher was having difficulty finding coverage for his "day of rest" and stated the "Town is designating Wednesdays as your day of rest each week." However, they placed a caveat on his "day of rest" stating "occasions may arise where you are required to report to work on some Wednesdays."

140.    Thus, Defendant effectively denied Mr. Fisher's reasonable accommodation, and continued to otherwise violate the law by interfering with Mr. Fisher's FMLA time.

141.    Within its 2023 Annual Report, the WPD admitted it had been "in a basic maintenance status since early 2021 due to extremely short staffing and other issues causing the department to adopt a reactive policing approach and triaging calls for service which limited the level of service the department has been able to provide to the Town of Winchester.  These staffing issues required the department to heavily rely on mutual aid partners for the use of on-call officers responding to home after hours."

142.    This was true in that they were short-staffed, but it was because they refused to hire, or allow Mr. Fisher to adequately staff, the department.

143.    On or about January 11, 2024, Acting Police Administrator C. Rataj contacted the NH Police Standards and Trainings Conduct Review Committee (CRC) to conduct an independent internal investigation into alleged law enforcement issues concerning Mr. Fisher responding to a November 4, 2023 domestic violence call.

23

144. Notably, this call was over two months before, and this request was after the many reports, on several issues, which Mr. Fisher had made to Defendant's agents about violations of law and other public policies.

145. On or about January 29, 2024, Defendant sent/gave a letter to Mr. Fisher regarding his OCH and being compensated pursuant to the FLSA. Defendant stated OCH are not hours spent working, "because during this time you are waiting to be engaged. You are not engaged to wait during this time. As such, those hours are not compensated for and do not count towards overtime."

146. The letter went on to confirm that although Mr. Fisher was not required to be at the WPD when he was OCH, he was expected to call dispatch within 15 minutes of a call and that he could not be more than 30-minutes from the Town of Winchester, effectively keeping Mr. Fisher from travel of any distance, or being able to enjoy being involved in extracurricular activities such as swimming, hiking, golfing and the like, or having a beer with dinner or at a party, even if he could get to the Town of Winchester within 30-minutes.

147. Therefore, this was not "time off", he was not waiting to be engaged, he was actually in a work status under these conditions, and should have been compensated with overtime for the on call hours, whether or not called out into the field.

148. Mr. Fisher asked Defendant for copies of his timecards for the past three years, but the Town refused to provide them, even though he was entitled to them as a part of his personnel file or documents. Eventually, Defendant did provide this information.

149. Mr. Fisher, acting under RSA 105:19 and 275-E, reported Rataj's double dipping scheme to Captain Rice, in writing.

24

150.    Allegedly, Rataj was working for Defendant and working for Hinsdale at the same time, being paid by both for some of the same hours.

151.    Mr. Fisher had done 91-A requests to Winchester and Hinsdale to demonstrate this.

152.    In or around March 2024, Chief Rataj's Hinsdale contract was not renewed, presumably due to double dipping.

153.    Therefore, on or about March 14, 2024, Captain Rice was promoted to Chief, by which time he reportedly had recently taken the "law package" at NH Police Standards and Training.

154.    On the same night Captain Rice was promoted to Chief, (March 14, 2024), Defendant placed Mr. Fisher on paid administrative leave alleging he violated various policies of the Department and Town Policies on or about November 4, 2023 (four months' prior).

155.    Defendant stated within the Notice of Administrative Leave that they anticipated his leave would run from March 14, 2024 to April 3, 2024, at which point Defendant would contact him.  No such contact occurred.

156.    Instead, on or about April 5, 2024, the Conduct Review Committee ("CRC") completed its investigation.  Mr. Fisher believes the CRC was given information outside of the investigation, and that this was improper and retaliatory, as was the investigation.

157.    Thereafter, on or about April 23, 2024, Chief Rice reviewed the CRC report along with other documents and apparently agreed with the report.

158.    Mr. Fisher vehemently denies any wrongdoing on his part, and had just been starting his investigation of the subject case, in which he already had conflicting reports, and was

being careful not to violate the rights of any individuals. These are only a few of the reasons he had determined not to make an early arrest.

159. On May 3, 2024 Defendant WPD, through Chief Rice, issued a Notice of Charges to the BOS against Mr. Fisher without the benefit of any input by Mr. Fisher, including factual discrepancies and erroneous legal conclusions within the CRC Report, even though in Defendant's March 14, 2024, letter they had promised Mr. Fisher he would be offered the opportunity to "come in and speak with [him] prior to issuing any recommendations".

160. Within the May 3, 2024 Notice of Charges, Chief Rice alleged he took the CRC April 5, 2024 report into consideration along with other alleged instances of misconduct all reported by Acting Police Chief Rataj, and based on this information recommended Mr. Fisher be terminated, again without ever speaking with Mr. Fisher.

161. On or about May 12, 2024, Mr. Fisher's counsel (Hoppock) contacted Defendant's counsel asking that Mr. Fisher be afforded a meeting with Chief Rice prior to Defendant terminating Mr. Fisher. Defendant declined.

162. Knowing Defendant was getting ready to terminate him, and not wanting that on his record after years of the mistreatment and retaliation he had suffered, Mr. Fisher sent his resignation letter to Defendant BOS dated June 6, 2024 in which he stated he was wrongfully discharged due to Defendant's repeated history of harassment and retaliation due to his whistleblowing and actions in furtherance of public policies as well as their willful failure to pay him overtime due him.

163. Thus, Mr. Fisher was wrongfully discharged, constructively, as no reasonable person could be expected to endure the environment Mr. Fisher was working in.

164.    Defendant's conduct was intentional, egregious, malicious, done with deliberate indifference, knowing, oppressive, wanton, reckless, willful, intentional, negligent and/or grossly negligent, and justifies an award of enhanced compensatory damages.

165.    Defendant's actions constituted a pattern and/or practice of illegal activities and wrongful activities, which it knew, or should have known, to be illegal and contrary to the laws of the State of NH and United States, including their Constitutions.

166.    Due to the actions of Defendant, Mr. Fisher claims damages which are within the jurisdictional limits of this Court, including liberal compensatory/enhanced damages, overtime pay, back and front pay and lost benefits including loss of contributions into his pension by the State, damages for loss of reputation, slander, libel, emotional distress, embarrassment, humiliation, aggravation, anxiety, fear, loss of sleep, physical and emotional symptoms and distress, liquidated damages, attorneys' fees for his defenses of actions taken against him by Defendant in all forums in which they are or have been involved, for negative tax consequences, reasonable costs and attorneys' fees related to this action, and other actions, and all other damages as allowed by law which he has suffered due to Defendant's actions as allowed herein.

167.    Plaintiff claims all equitable relief to which he is entitled, including increased training for the Selectmen and Police Department on issues of wages/overtime, discrimination and constitutional rights.

**COUNT I**
**WAGE CLAIM FOR OVERTIME**
**NH RSA 279 et seq. and**
**The Fair Labor Standards Act of 1938, as amended (FLSA)**
**29 U.S.C. 201, et seq.**

168.    Plaintiff incorporates herein each and every allegation raised elsewhere in the Complaint as if fully set forth herein, and further states as follows:

169.    NH RSA 279 et. seq., including 279:21, VIII requires the payment of all hours worked beyond 40 in any week at the rate of one and a half times the regular hourly rate.

170.    Pursuant to the Fair Labor Standards Act (FSLA), 29 U.S.C. 207(a)(1), Mr. Fisher is entitled to overtime pay from Defendant for hours worked over 40 in a workweek at a rate not less than time and one-half of his regular rate of pay.

171.    The FLSA and NH RSA 279:27 require employers to maintain accurate records of all time worked, and wages earned.

172.    Scheduling of hours for the police department for policemen was generally done on a monthly basis, but often changed during the month due to staffing shortages.

173.    Defendant did not maintain accurate records of all the time Plaintiff worked, including while he was on call (OCH), whether called out or not, because of the restrictions on his freedom during on call time, as described above including, but not limited to, paragraphs 146-149 above.

174.    Plaintiff worked overtime in many of the weeks he was employed as set forth above, and as the evidence will show, which Defendant orchestrated, and then refused to pay Mr. Fisher most of the overtime due to him.

175.    Defendant has violated the FLSA and State law by willfully not paying Mr. Fisher all of the overtime that is due to him, and not keeping track of his hours worked, as indicated elsewhere herein.  (e.g. Comp:127, 129)

176.    Defendant has refused to pay Mr. Fisher his overtime wages from early 2021 through March 14, 2024, the date he was suspended, and for all times he was performing overtime, including OCH.

177.    Defendant is obligated under the FLSA and/or State law to compensate Plaintiff for approximately 6,926.95 hours of overtime worked.  Plaintiff is due approximately $318,001.47 in overtime wages, including for time spent OCH, which should be multiplied by 2 as liquidated damages, for a total of approximately $636,002.94. This amount is subject to adjustment, as the evidence gained through discovery may show.

178.    Defendant's failure to pay Mr. Fisher his overtime for all overtime hours worked including those he was on call (OCH) was intentional, voluntary, willful and knowing, as it should have understood the NH law and the FLSA, and therefore the amount due to him should be doubled as liquidated damages.

179.    Defendant purposefully refused to allow Mr. Fisher to hire additional police officers, which had been approved and budgeted for, while it continued to use him to cover a large part of the on call hours, mostly without compensating him.  This constituted bad faith and retaliation by Defendant.

180.    During periods of time, instead of having paid Mr. Fisher the amount he was due for overtime, or allowing him a day off, it hired contract workers from other towns, including Rataj, who was double dipping pay for hours also working for Hinsdale, at a rate higher than Mr. Fisher would have been paid.  This constituted bad faith and retaliation by Defendant.

181.    Defendant's conduct indicates it either knew, or showed a reckless disregard for, purposefully attempted to manipulate wages, and/or acted with plain indifference to whether or not its failure to pay Mr. Fisher his overtime, including time on OCH, was prohibited by either, or both, state and federal labor laws.

182.    Mr. Fisher claims all overtime, which was due to him and not paid, for each hour he worked over 40 in one week.

183. In addition, Defendant's failure to pay Mr. Fisher all OCH and overtime due him, has negatively impacted his pension as said wages were not calculated into his retirement/ pension amount, for which he also claims an additional amount which should have been and/or should be paid based on this recovery.

184. Because of Defendant's willful and knowing conduct in failing to pay his wages, and benefits (including retirement), Mr. Fisher should be awarded liquidated damages in double the amount of the unpaid wages and benefits.

185. Mr. Fisher also claims attorneys' fees and costs for pursuing these claims.

## COUNT II
## NH RSA 275-E, et seq.
## WHISTLEBLOWER'S PROTECTION ACT

186. Plaintiff incorporates herein each and every allegation elsewhere in the Complaint as if fully set forth herein, and further states as follows:

187. Most of what Mr. Fisher reported as wrongful conduct also serves as a basis for wrongful discharge, Count III below.

188. Mr. Fisher reported what he believed were serious violations of law, regulations and ethics in the workplace by Defendant and others as described above including, but not limited to, the following:

A. Complaining about and trying to prevent disability discrimination of Sgt. K.F. and Platz, including showing up as requested at a hearing on K.F. (22, 30, 34, 35, 40-45, 80, 109-112, and 113[1]);

B. Wrongful termination of Sgt. K.F. (13-14);

C. Violation of state and federal (FLSA) wage and hour overtime laws, primarily the failure to pay overtime and complaining about same and asking for correction (90, 146-147, and repeatedly);

---

[1] Paragraph numbers, while not believed required, are offered as a guide to the allegations, but are not necessarily exhaustive thereof in this lengthy Complaint. Also, where some allegations fall under more than one category, the number is not necessarily repeated.

D.    Reporting the Edson matter to the AG for proper investigation and refusing to disclose confidential information on the investigation as directed by the AG investigating the case, when demanded by the Selectboard (one of whom was related to the victim and had already witness tampered, which was also reported) (17-21), and reporting the interference with this investigation;

E.    Refusing, and encouraging the Defendant/BOS not to violate constitutional rights of officers, including discrimination and suspension without pay (e.g. Fox, Platz, Edson) (13-15, 21, 22, 111-113);

F.    Violation of the FMLA by failing to allow Mr. Fisher his FMLA time, which was approved (31, 32, 43, 44 58, 62, 74, 85, 87, and 138-141);

G.    Not allowing Mr. Fisher as officer in charge to exercise the statutory duties of police chief (16, 86, 97-98, 124-128 and many others);

H.    Complaining about uncertified officers, and not being allowed to supervise and field train the unqualified/uncertified officers, including Josephson and Rice (29, 62, 130-132, 136, 137);

I.    Objecting to and reporting the impropriety of an uncertified officer, and/or the Town Administrator/employee having keys to the evidence room and the use of a high school student in that room (81-83);

J.    Not being allowed to schedule training, which he was in charge of for the Police Department, which included training on discrimination and retaliation (100-105);

K.    Reported double-dipping by Hinsdale Chief Rataj (151-153);

L.    Besides the FMLA issue, objecting to not being given a day of rest, as required by State law (134, 138-140);

M.    Objecting to being forced to work overtime and OCH hours in excess of any reasonable number, combined with not being paid for all overtime due him (133-135, and repeated);

N.    Refusing to make an arrest he did not believe warranted at the time, which would potentially violate a citizen's constitutional rights, and thereafter being investigated for his actions (63-66 );

O.    His refusal to do an internal investigation on an officer who no longer worked there, as it would be in appropriate (DP) (59-63);

P.    Being sent into an investigation without proper notice or Garrity Rights until he insisted on them (63-69);

31

Q.    Reporting to the Town that it was improperly using mutual aid to cover shifts that they should have a paid officer to cover (84);

R.    Reporting discrepancies in pay and record keeping of hours worked and pay (89-94);

S.    Complaining that a scheduled meeting for April 2023 was not properly a non-public meeting pursuant to NH RSA 91-A, as scheduled (114-117);

T.    Not being allowed to hire sufficient additional officers in order to prevent excessive overtime work, for which they were either under, or not paying him and others for (26, 27, 43 and 182); and

U.    On or about December 15, 2021, Mr. Fisher notified the investigator for the AG's Office about the Town's interference with the Edson case (32).

189.    The actions of Defendant including, but not limited to, the above are actions Mr. Fisher took in support of public policies, which encompassed reporting violations of various laws, rules, and regulations of the State of New Hampshire, US and NH Constitutions and regulations of Defendant.

190.    Mr. Fisher suffered much retaliation due to his numerous reports of wrongdoing, unethical and illegal activities; violation of rules, regulations, policies and laws; and requests for correction, as partially described above.  The retaliation also included placing him on the EES, and then publicizing it before any such posting was to be made public; furthermore, Defendant's attempt to place Mr. Fisher on that list has been found to be improper by a court.

191.    Defendants violated RSA 275-E et seq., including but not limited to RSA 275-E:2, as Defendant harassed, abused, intimidated, retaliated against, and threatened Mr. Fisher in the terms, conditions, and/or privileges of employment, as partially described above, and which led to his constructive discharge. Said behavior included, but was not limited to, the following:

A.    Placing officers above him who were uncertified in NH (45, 62, 80, 130, 132, 136);

32

B.      Having Mr. Fisher investigated after his complaints for something that happened over two months prior, where he had not even finished investigating (144-145);

C.      Attempting to demote Mr. Fisher from Officer in Charge shortly after Defendant received a letter from AG Sullivan on or about September 28, 2021, that a criminal investigation against Officer Edwon had been commenced (23-25);

D.      Refusing to allow Mr. Fisher to hire additional staff (26);

E.      On or about January 11, 2024 contacting the CRC to conduct a review of Mr. Fisher stemming from a November 2023 domestic violence call  (144-145); and

F.      All other harassment, interference with his job, discipline, suspension without pay, and wrongful termination.

192.    Defendants violated the Whistleblower's Protection Act with respect to Mr. Fisher, as described herein, and as a result Mr. Fisher has suffered damages.   Other instances in Count III below are incorporated herein by reference.

193.    Therefore, Mr. Fisher claims damages which are within the jurisdictional limits of this Court and as described elsewhere herein, and all equitable relief to which he may be entitled.

## COUNT III
## WRONGFUL DISCHARGE (CONSTRUCTIVE)

194.    Plaintiff incorporates herein each and every allegation elsewhere in the Complaint as if fully set forth herein, and further states as follows:

195.    Mr. Fisher took actions supported by public policies, and reported various violations of laws, rules and regulations to Defendant Town, as described above, which public policy encourages.

196.    Mr. Fisher had also insisted on protecting the public, which was in accord with his training, national police training standards, and many years of experience in law enforcement.

197.    Mr. Fisher reported what he believed were serious violations in the workplace, including disability discrimination of Sgt. K.F. , wrongful termination of Sgt. K.F. , violation of FSLA laws including failure to pay overtime, failing to allow Mr. Fisher his own reasonable

33

accommodation of one full day off per week, in violation of employment laws, allowing uncertified chiefs of police to be the Officers-in-Charge, all of which constitute violations of laws, regulations and/or rules pursuant to laws of the State of New Hampshire.   See lists in Count II above, which are incorporated herein by reference.

198.    Mr. Fisher's reporting of both Captain David Rice and Chief Josephson's lack of certification, served to uphold his office, the policies of the New Hampshire Police Standards & Training, the laws of this state, and to protect the public.

199.    Mr. Fisher's job description stated "…serve as acting Chief of Police in his absence".  Thus as "officer-in-charge" the state law provides that the "chief of police, superintendent of police, or city marshal of any city or town who is appointed rather than elected, shall have authority to direct and control all employees of his or her department in their normal course of duty and shall be responsible for the efficient and economical use of all department equipment." NH RSA 105:2-a Police Chiefs; Powers; Dismissal.

200.    Defendant Town undermined Mr. Fisher's authority as "Officer-in-Charge", contrary to law including the above, by refusing to allow him to be involved in the hiring process of much-needed police officers, and preventing him from upholding the law and protecting the public.

201.    Due to said actions, Mr. Fisher felt he had no choice but to resign as the performance of his duties was repeatedly undermined and had lost all confidence in Defendant Town's ability to act in a professional and impartial manner. In addition, it was clear by Defendant's actions that they intended to terminate Mr. Fisher, having attempted to do so in the recent past as well.

34

202.    Mr. Fisher believes his position with Defendant was tenuous because of his numerous complaints including, but not limited to, a lack of overtime, following the law regarding the Edson investigation (protesting discussions about it), as well as speaking up for Officer K.F. and his reasonable accommodation. This all caused Mr. Fisher extreme stress.

203.    Mr. Fisher was harassed and retaliated against for his upholding, and attempting to uphold, the laws, rules, and regulations of this state, which caused a hostile environment that no reasonable person would endure, and which caused his resignation, a constructive wrongful discharge from employment with Defendant.

204.    Defendant's actions and wrongful discharge as alleged in the facts of this complaint, have caused Mr. Fisher damages which are within the jurisdictional limits of this Court and are described elsewhere herein.

205.    Mr. Fisher claims all damages as allowed by law, and all equitable relief to which he may be entitled.

**COUNT IV**
**VIOLATION OF CONSTITUTIONAL RIGHTS**
**FIFTH AMENDMENT AND FOURTEENTH AMENDMENTS**
**RIGHT TO DUE PROCESS AND**
**FREEDOM OF SPEECH**
**42 U.S.C. § 1983 and 1988**
**NEW HAMPSHIRE CONSTITUTION**

206.    Plaintiff incorporates herein each and every allegation elsewhere in the Complaint as if fully set forth herein, and further states as follows:

207.    Defendant violated Mr. Fisher's constitutional rights by suspending him, and Sgt. K.F., without pay. *E.g. see Matthews v. Eldridge,* for noting illegal discrimination perpetrated against him for whistleblowing regarding Defendant's ADA violations, overtime violations, and interference with his own FMLA rights, and for retaliation for attempting to exercise those rights,

35

as well as Defendant's violation of the NH Police Standards noted by Plaintiff. (COMP:46-48 and 62.)

208.    Defendant, acting under color of state law, subjected Plaintiff or caused Plaintiff to be subjected to the deprivation of rights, privileges, and/or immunities secured by the Constitution or laws of the United States, specifically the First Amendment[2] to the United States Constitution, as well as his right to due process for the property right he had in his employment. Defendant's actions were done intentionally and/or recklessly with deliberate disregard for the Plaintiff's rights.

209.    The Town had a policy, practice, or custom, either express or implied, encouraging or condoning misconduct of the type claimed by Plaintiff at the time of its occurrence, and said policy, practice or custom rose to the force of law, and was a substantial factor in causing the constitutional deprivation complained of.

210.    The right to petition necessarily includes the right to make requests for information both in person and in writing, to speak up in public town meetings, in public, and to question town officials.

211.    Defendant's actions as described herein violated Plaintiff's First Amendment rights and have caused him damages which are within the jurisdictional limits of this Court, as described elsewhere herein.

212.    Plaintiff claims all damages as allowed by law and all equitable relief to which he may be entitled.

---

[2]"Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

**COUNT V**
**FAMILY MEDICAL LEAVE ACT (FMLA) 29 U.S.C. §2601, et seq.**
**VIOLATION, INCLUDING INTERFERENCE AND RETALIATION**

213.    Plaintiff incorporates herein each and every allegation elsewhere in the Complaint as if fully set forth herein, and further states as follows:

214.    In November 2023, Mr. Fisher applied for FMLA to have at least one day per week, 24 consecutive hours off due to his own serious health condition.

215.    While this was purportedly, and officially, granted, it was never put fully into place, as Defendant refused to adequately staff to allow this necessary time off.

216.    Even with this one day per week off, at times Mr. Fisher would be working upwards of 70 hours per week.  (COMP:137-142)

217.    On or about January 20, 2022, Chief Josephson advised Mr. Fisher he was attempting to get outside agencies to cover shifts so Mr. Fisher could get a day of rest; however, in the meantime Mr. Fisher was required to cover all OCH, even with a doctor's note stating the need for one full day off duty.  This constituted interference with FMLA.

218.    Defendant's actions as alleged in the facts of this complaint, were done knowingly and willfully in violation of the FMLA, and have caused Mr. Fisher damages which are within the jurisdictional limits of this Court and are described elsewhere herein.

219.    Mr. Fisher claims all damages as allowed by law, and all equitable relief to which he may be entitled.

WHEREFORE, Plaintiff prays this Honorable Court order:

A.    Back wages, overtime, together with lost fringe benefits and any other benefits, including increased retirement benefits, which Plaintiff should have earned and for damages he is recovering herein;

B.      Order Defendant to pay Plaintiff unpaid wages/compensation for overtime he worked as required by NH State Law, and the FLSA, in the amount of $318,001.47, or such other amount as the evidence shows;

C.      Order Defendant to pay Plaintiff liquidated damages in the amount double the amount of unpaid wages and benefits, including retirement benefits that should have been paid into his account by the Defendant;

D.      Lost wages and benefits from the date of termination forward;

E.       Reinstatement;

F.      Compensatory damages;

G.      Enhanced compensatory damages for the aggravating circumstances;

H.      Damages for violation of his constitutional rights;

I.      Punitive damages where allowed by law;

J.      Damages for loss to his reputation;

K.      All other damages as set forth herein and as allowed by law, including but not limited to those described herein;

L.      Reasonable attorney fees, interest and costs;

M.      An amount to be awarded by the Court to make up for any adverse tax consequences due to any judgment or award;

N.       All equitable relief to which Plaintiff may be entitled;

O.      Such other and further relief as is just and equitable.

P.      Order Defendant to pay attorney fees and costs incurred by Plaintiff in this action, as allowed by both state law and the FLSA, plus interest; and

Q.      Grant such other and further relief as may be deemed just and proper.

Respectfully submitted,
**JAMES J. FISHER, JR., Plaintiff**
By his attorney


Dated: <u>February 10, 2025</u>          By:     <u>      /s/ LESLIE H. JOHNSON      </u>
Leslie H. Johnson, Esquire – NH Bar #5545
Law Office of Leslie H. Johnson, PLLC
PO Box 265
Center Sandwich NH 03227
603.284.6600
<u>leslie@lesliejohnsonlaw.com</u>

39